11-3865-cv(L)
Izzarelli v. R.J. Reynolds Tobacco Co.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: March 18, 2013     Decided: September 10, 2013)

Docket Nos. 11-3865-cv(Lead) 11-3890-cv(XAP)

- - - - - - - - - - - - - - - - - - - - - -x

BARBARA A. IZZARELLI,

             Plaintiff-Appellee-Cross-Appellant,

        - v.-

R.J. REYNOLDS TOBACCO COMPANY,

             Defendant-Appellant-Cross-Appellee.

- - - - - - - - - - - - - - - - - - - - - -x


    Before:        JACOBS, Chief Judge, CABRANES and WESLEY,
                   Circuit Judges.

Barbara Izzarelli sues R.J. Reynolds Tobacco Company under Connecticut state law claiming that the cigarettes she smoked for 25 years were defective and caused her cancer.  A jury found that the cigarettes were defective, and the United States District Court for the District of Connecticut (Underhill, J.) entered judgment in Izzarelli's favor.  R.J. Reynolds Tobacco Company appeals the judgment, arguing that Connecticut law forecloses strict products liability suits

against a cigarette manufacturer absent evidence that the cigarettes were contaminated or adulterated.  Because this question of Connecticut law is open and decisive, we certify it to the Connecticut Supreme Court, and stay resolution of this case in the interval.

DAVID S. GOLUB (Jonathan M. Levine, Marilyn J. Ramos, on the brief), Silver Golub & Teitell LLP, Stamford, Connecticut, for Plaintiff-Appellee-Cross-Appellant Barbara A. Izzarelli.

MARK R. SEIDEN (Todd R. Geremia, David M. Cooper, Jones Day, New York, New York, Theodore M. Grossman, Mark A. Belasic, Jones Day, Cleveland, Ohio, on the brief), Jones Day, New York, New York, for Defendant-Appellant-Cross-Appellee R.J. Reynolds Tobacco Company.

DENNIS JACOBS, Chief Judge:

Barbara Izzarelli brings claims against defendant R.J. Reynolds Tobacco Company ("R.J. Reynolds") under the Connecticut Products Liability Act ("CPLA"), Conn. Gen. Stat. Ann. § 52-572m et seq., for strict liability and negligence, arguing that the cigarettes she smoked for 25 years caused cancer in her larynx.[1]  A jury in the United

---

[1]    Izzarelli also brought a claim under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110a et seq., for unlawful youth marketing.  The

States District Court for the District of Connecticut (Underhill, J.) found R.J. Reynolds liable (and 58 percent at fault under Connecticut's comparative negligence scheme), and awarded Izzarelli $7,982,250 in compensatory damages; punitive damages, which the district court calculated as $3,970,289.87; and $16,127,086.40 in offer-of-judgment interest.

R.J. Reynolds appeals the denial of its renewed motion for judgment as a matter of law, arguing principally that Izzarelli's claims are foreclosed by Connecticut law and the Restatement (Second) of Torts § 402A, as adopted by the Connecticut Supreme Court, Giglio v. Conn. Light & Power Co., 429 A.2d 486, 488 (Conn. 1980), which (R.J. Reynolds argues) precludes strict products liability suits against a seller of "good tobacco."[2]

district court granted R.J. Reynolds's motion for summary judgment on that claim, and Izzarelli does not appeal that decision.

[2] The parties also argue issues involving admissibility of evidence and punitive damages. Since we are certifying the principal and threshold legal issue, we need not decide those issues now, and will decide them depending on how the Connecticut Supreme Court decides the certified question. For this reason, we will limit our discussion of the facts to those relevant to the question at issue.

Because this question is undecided under Connecticut law, we certify it to the Connecticut Supreme Court and stay resolution of this case in the interval.

**BACKGROUND**

Izzarelli tried cigarettes at age twelve, in 1970. By 1972, Izzarelli was smoking a pack a day of Salem Kings brand cigarettes ("Salems"), manufactured by R.J. Reynolds. Izzarelli smoked Salems for the next 25 years, at least two packs a day. In 1996, she was diagnosed with laryngeal cancer. After a laryngectomy in January 1997, she no longer has a voice box and breathes through a tracheotomy hole in her throat. She has undergone numerous surgeries to fix breathing problems, and can eat only soft foods.

Dr. Alexander Glassman, a psychiatrist, testified at trial that Izzarelli was "severely addicted" to nicotine. Other experts retained by Izzarelli testified that her cancer was caused by smoking: Dr. Marshall Posner, Izzarelli's expert on cancer, testified that he was "absolutely convinced" this cancer was caused by smoking, and that 95 percent of laryngeal cancers are caused by smoking; and Izzarelli's treating otolaryngologist, Dr.

4

Thomas Lesnik, testified that her cancer was caused by her smoking.

At trial, Izzarelli introduced evidence that R.J. Reynolds manufactured Salems to specifications intended to get non-smokers addicted to nicotine and to get addicted smokers to smoke more cigarettes without satiating their addiction:

- R.J. Reynolds understood that it had to accomplish two things to sell more cigarettes: (1) maintain smokers' addiction by increasing the nicotine "kick" felt by the smoker with each drag; and (2) reduce the total nicotine level (the nicotine "yield") in cigarettes to require smokers to purchase more cigarettes to fulfil their addiction's daily requirement.

- R.J. Reynolds had discovered certain means to alter the levels of "free nicotine" in smoke, and thereby increase the nicotine "kick" by varying blends, additives, filters, and papers. Dr. Grunberg testified that R.J. Reynolds used "blend formation and denicotinization" to alter the amount of free nicotine in Salems.

- R.J. Reynolds could manipulate the nicotine yield, and indeed had lowered it from 2-3 milligrams per cigarette in the 1950s and 1960s to approximately 1.3 milligrams per cigarette at the time of trial. One internal document put the question this way: "How low can we go?" The goal was to identify the lowest nicotine yield that would keep smokers addicted while requiring them to smoke more cigarettes to feed their addiction. Lower yield (to a point) therefore requires more smoking, which increases the likelihood of cancer.

R.J. Reynolds elicited testimony that Izzarelli's cancer was not specific to Salems; the opinions of Izzarelli's experts would not change if she smoked a different brand. Dr. Neil Grunberg, a psychologist giving expert testimony on addiction, stated that all tobacco was addictive, and that nothing in Salems changes their addictive nature. Dr. Glassman, too, testified that Izzarelli's addiction did not depend on the fact that she smoked Salems; any cigarettes would have had the same effect. And Dr. Lesnik testified that he did not need to know what brand of cigarettes Izzarelli smoked to conclude that smoking caused her cancer.

At the close of Izzarelli's case, R.J. Reynolds moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. The district court reserved ruling on that motion. After the jury returned its verdict and judgment was entered in favor of Izzarelli, R.J. Reynolds timely renewed that motion and, in addition, filed a motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. The district court denied both motions. R.J. Reynolds appeals.

## DISCUSSION

We review the denial of a motion for judgment as a matter of law de novo, "applying the same standards as the district court to determine whether judgment as a matter of law was appropriate." Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 120 (2d Cir. 1998). Judgment as a matter of law is appropriate if, after reviewing the evidence in the light most favorable to Izzarelli, the nonmovant, "there can be but one conclusion as to the verdict that reasonable [jurors] could have reached." Samuels v. Air Transp. Local 504, 992 F.2d 12, 14 (2d Cir. 1993) (quotation marks omitted); see also Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 326 (2d Cir. 1999).

7

Izzarelli sues under the CPLA, Conn. Gen. Stat. Ann. § 52-572m et seq. The CPLA allows a person injured by a defective or hazardous product to bring a claim rooted in "negligence, strict liability[,] and warranty, for harm caused by a product." Id. § 52-572n(a). The certified question concerns solely strict liability. In order to prove a strict liability claim under the CPLA, it must be shown "that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." Giglio v. Conn. Light & Power Co., 429 A.2d 486, 488 (Conn. 1980) (citing Restatement (Second) of Torts § 402A (1965)). For the purposes of the question presented for certification, the decisive issue is the existence of a defective condition.

The Connecticut rule for strict liability is drawn from section 402A of the Restatement (Second) of Torts. See id; Wagner v. Clark Equip. Co., Inc., 700 A.2d 38, 50 (Conn. 1997). Section 402A provides:

> (1) One who sells any product in a defective condition *unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(Emphasis added). Comment i, which defines "unreasonably dangerous," excludes the harmful effects of "good tobacco":

> The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. . . . *Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. . . .*

(Emphasis added). The Connecticut Supreme Court has explicitly adopted Comment i's definition of "unreasonably dangerous." Wagner, 700 A.2d at 50. R.J. Reynolds argues that Comment i precludes Izzarelli's suit because she has not produced evidence of contamination or adulteration-- "something like marijuana."

9

The Connecticut Supreme Court has not considered the proviso for "good tobacco" in Comment i. The only Connecticut case that decided the issue is Estate of DuJack v. Brown & Williamson Tobacco Corp., an oral ruling from the bench. X07-00728225-S, 2001 WL 34133836 (Conn. Super. Ct. Nov. 13, 2001). The court assumed "that [plaintiff] did smoke Kool cigarettes, that she became addicted to Kool cigarettes at an early age, that this addiction did her harm, and that the cigarette smoking that she did caused her lung cancer, and the other injuries that resulted from having the lung cancer." Id. at *1. The DuJack court dismissed the complaint, relying on Comment i: "you cannot make a claim that cigarettes are an unreasonably dangerous or defective product because the nicotine in them causes harm." Id. at *3. At the same time, the court distinguished a hypothetical case in which a plaintiff alleged "that Kool cigarettes have some peculiar manufacturing process with filters or their papers or any additives or any genetic processing that makes Kool cigarettes different than any other cigarette." Id. at *2.

It is unclear whether Comment i precludes all products liability claims in Connecticut against tobacco companies absent allegations of contamination or adulteration. When

10

Comment i was adopted in 1965, it was widely known that smoking is dangerous and can be addictive.  So it makes sense to conclude that a cigarette cannot be "*unreasonably dangerous*" when manufactured consistent with industry norms. Izzarelli argues, however, that Comment i specifies "good tobacco" *as opposed to* "good cigarettes," and therefore does not bear upon the manufacturing process; that a cigarette is a nicotine delivery device that can change how tobacco is smoked and its effect on the smoker; and that R.J. Reynolds varied the blends and components to make Salems more addictive, and varied the nicotine levels to maximize the number of cigarettes needed per day to satisfy the addiction.

Whether Comment i precludes claims under the CPLA against cigarette manufacturers absent evidence of contamination or adulteration has not been decided in Connecticut.  This question is one of state law and is vigorously argued on both sides.  We therefore think it prudent to certify this question to the Connecticut Supreme Court.

11

**CONCLUSION**

For the foregoing reasons, we hereby **CERTIFY** the following question to the Connecticut Supreme Court: Does Comment i to section 402A of the Restatement (Second) of Torts preclude a suit premised on strict products liability against a cigarette manufacturer based on evidence that the defendant purposefully manufactured cigarettes to increase daily consumption without regard to the resultant increase in exposure to carcinogens, but in the absence of evidence of any adulteration or contamination? We **STAY ADJUDICATION** of this dispute until we receive guidance from the Connecticut Supreme Court. The Connecticut Supreme Court may modify this question as it sees fit and add any pertinent questions of Connecticut law that the Court chooses to answer. This panel retains jurisdiction over this case and will decide it once the Connecticut Supreme Court has either provided us with its guidance or declined certification.

It is therefore **ORDERED** that the Clerk of this Court transmit to the Clerk of the Connecticut Supreme Court a Certificate, as set forth below, together with this decision and a complete set of the briefs, appendices, and record filed in this Court by the parties.

**CERTIFICATE**

The foregoing is hereby certified to the Connecticut Supreme Court, pursuant to Conn. Gen. Stat. Ann. § 51–199b and 2d Cir. R. 27.2, as ordered by the United States Court of Appeals for the Second Circuit.